# In the United States Court of Federal Claims

No. 16-420C
(Filed Under Seal:  October 13, 2017)
(Reissued for Publication:  October 26, 2017)[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| ZEBEL, LLC, | * |
| Plaintiff, | * RCFC 56; Cross-Motions for Summary Judgment; No Genuine Issues of Material Fact; Contract Interpretation; Implied Duty of Good Faith and Fair Dealing; Adequate Disclosure; Lack of Express Warranty; Binding Offer; Attempted Revocation of Offer |
| v. | * |
| THE UNITED STATES, | * |
| Defendant. | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>Jon W. van Horne</u>, Gaithersburg, MD, for plaintiff.

<u>Tanya B. Koenig</u>, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

In this case, plaintiff Zebel, LLC alleges that the United States General Services Administration ("GSA") breached an implied-in-fact contract by failing to honor plaintiff's revocation of its auction bid to purchase certain real estate.  Plaintiff further alleges that the GSA breached its implied duty of good faith and fair dealing by failing to disclose certain information regarding the real estate at issue.  Plaintiff seeks the return of its $100,000 bid registration deposit and attorney's fees under the Equal Access to Justice Act.

Before the court are the parties' cross-motions for summary judgment, filed pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").  For the reasons explained below, the court finds that there are no genuine issues of material fact, denies plaintiff's motion for summary judgment, and grants defendant's cross-motion for summary judgment.

---

[*]  The court issued this Opinion and Order under seal on October 13, 2017, and directed the parties to submit proposed redactions.  This reissued Opinion and Order incorporates the redactions proposed by the parties.  All redactions are indicated by a bracketed ellipsis ("[. . .]").

# I. BACKGROUND

Plaintiff provides a discussion of the factual background in its motion for summary judgment.  See Pl.'s Mot. Summ. J. ("Pl.'s Mot.") 2-5.  In its response and cross-motion, defendant provides a statement of the case.  See Def.'s Resp. Pl.'s Mot. Summ. J. & Cross-Mot. Summ. J. ("Def.'s Cross-Mot.") 1-8.  The facts discussed herein are derived from both parties' submissions, including the attached appendices and exhibits, and are undisputed.  Only one citation is provided for each duplicative submission.

## A.  History of the Real Estate at Issue

Subtitle I of Title 40 of the United States Code was enacted to "provide the Federal Government with an economical and efficient system" for, among other purposes, the "[d]isposing of surplus property," 40 U.S.C. § 101(3) (2012), which is property that is not necessary "to meet the needs or responsibilities" of any federal agency, id. § 102(10).  The federal agency tasked with the responsibility of carrying out the purposes of Subtitle I, including the disposition of surplus property, is the GSA.  Id. § 121.

In 1980, the United States Social Security Administration's Metro West Facility ("Metro West") was constructed at 300 North Greene Street, Baltimore, MD.  Def.'s Cross-Mot. A5. Metro West is located on the northwestern edge of Baltimore's central business district, occupying 10.77 acres on two full city blocks zoned as B-5-1 for Central Commercial District. Id. at A5, A10.  The complex consists of two separate structures, the North and South buildings, linked by a two-story sky bridge that spans across a city street for a total of 1,085,741 gross square feet, as well as surface parking and a parking garage that can accommodate 518 vehicles. Id. at A5.  In January 2013, Metro West was reassessed for property tax purposes at a "Full Cash Value" of approximately $308.9 million.  Pl.'s Mot. Ex. Z.  At that value, the annual property taxes would have been approximately $7.4 million, i.e., $7.58 per square foot (compared to an average of $0.99 per square foot for "tax comparables"); however, federal government buildings are not subject to real estate taxes in Baltimore.  Id.  In April 2014, the Social Security Administration moved to a different location in the city.  Pl.'s Mot. Ex. A at 1.  Metro West was then earmarked for disposition, and has been vacant ever since.  Id.

In September 2014, the Metro West Advisory Committee, comprised of various stakeholders, was convened to "participate in a planning initiative" for Metro West, and a sub-committee "was tasked with evaluating the potential redevelopment plans, uses and market opportunities for the Metro West complex."  Pl.'s Mot. Ex. B at 1.  An appraisal report issued on March 5, 2015, concluded that [. . .].  Pl.'s Mot. Ex. Y at 2.  The appraiser noted that [. . .].  Id. In July 2015, the subcommittee determined that, due to Metro West's size and physical configuration, its "highest and best use" was demolition of the structures "in order to create a clean and clear site."  Pl.'s Mot. Ex. B at 7.

In the meantime, the GSA held a public Industry Day event on June 17, 2015.  Pl.'s Mot. Ex. BB at 2.  Approximately ten individuals attended Industry Day, which included a tour of the Metro West property; presentations regarding the terms and conditions of disposal options,

available tax incentives, zoning, and ongoing nearby development; and a question-and-answer session.  Id.  The summary report that was issued following Industry Day included a recommendation that the GSA conduct an online auction and an observation that there was a "very limited list of potential buyers/users" for Metro West, "most" of whom would likely engage in a "total demolition of all structures" following purchase.  Id. at 4.

## B. The Solicitation

On or about June 30, 2015, Pl.'s Mot. Ex. C, the GSA released its Invitation for Bid ("IFB") for the Metro West property.  See generally Pl.'s Mot. Ex. E.  The IFB contained, in relevant part, an introduction describing the complex, demographic data concerning the surrounding area, contact information for the City of Baltimore Planning Department, a detailed property description, a summary of the auction parameters, terms of the sale, instructions to bidders, and notices and covenants.  Id.  Participants were cautioned that "[e]ach bid shall be deemed to have been made with full knowledge of all terms, conditions, and requirements contained in [the] IFB and any amendments made thereto prior to bid acceptance."  Id. at 22.

Section 1 of the IFB's General Terms of Sale contained several definitions:

- "Purchaser" was defined as the "bidder whose bid the [GSA] accepts."

- "High Bidder" was defined as "the bidder, whose bid conforms to the terms and conditions of the IFB, is the highest dollar bid at the close of the auction and is determined by the [GSA] to be the most acceptable bid."

- "Back-up Bidder" was defined as "the bidder, whose bid conforms to the terms and conditions of the IFB, is the second-highest dollar bid at the close of the auction and is determined by the [GSA] to be the most acceptable bid."

- "Earnest Money" was defined as

  the Bidder's deposit of money demonstrating the Purchaser's good faith offer to the [GSA] to fully execute and comply with all terms, conditions, covenants and agreements contained in any contract resulting from the [GSA's] acceptance of the Bidder's offered bid price. Once a bid is accepted by the [GSA] for contract, all prior deposits made by the Purchaser to register for the sale . . . become Earnest Money to the benefit, custody, accountability and control of the [GSA].

Id. at 14.

Section 2 of the General Terms of Sale provided:

> The description of the Property, and all other information provided with respect to the Property set forth in the IFB, are based on the best information available to the GSA . . . and are believed to be correct. Any error or omission, including but not limited to, the omission of any information available to the [GSA] and/or any other Federal agency, shall NOT constitute grounds or reason for nonperformance of the contract of sale, or claim by Purchaser for allowance, refund or deduction from the purchase price.

Id. at 15.

Section 5 of the General Terms of Sale provided that the Metro West property was

> offered for sale **"AS IS" AND "WHERE IS"** without representation or warranty, express or implied. The Purchaser . . . acknowledges that the [GSA] makes no representations or warranty concerning the title, zoning, character, condition, size, quantity, quality and state of repair of the Property. . . . Purchaser shall rely <u>solely on its own due diligence</u> and examination of the Property. Purchaser acknowledges that there will be no claims or any allowances or deductions upon grounds that the Property is not in condition or fit to be used for the purpose of which intended by the Purchaser after the conclusion of the auction.

Id. (second emphasis added).

Section 9 of the General Terms of Sale specified that "bids made to purchase [Metro West] are binding offers," and provided that deposits and earnest money were "subject to forfeit . . . as damages for breach of contract" in the following situations:

- revocation of a bid after the conclusion of an auction, but prior to acceptance of the high bid;

- revocation of a bid after notice of acceptance;

- any default by the Purchaser in the performance of the contract of sale created by . . . acceptance [of a bid]; or

- failure by the Purchaser to consummate the transaction.

Id. at 16. Section 15 of the General Terms of Sale further specified:

> Each bid received shall be deemed to be a continuing offer for sixty (60) calendar days after the close of the online auction until the bid is accepted or rejected by the [GSA].
>
> If the [GSA] desires to accept any bid after the expiration of the sixty (60) calendar days, the consent of the bidder shall be obtained prior to such acceptance.

Id.  The closing date of the sale was set at no later than sixty days after acceptance.  Id. at 17.

The IFB's Instructions to Bidders contained the time period for the online auction, which was originally scheduled to run for seven weeks—from Tuesday, June 30, 2015, at 2:00 p.m. until Tuesday, August 18, 2015, at 2:00 p.m.[1]  Id. at 9, 18.  However, the GSA stated that the auction could continue beyond that date based on bidding activity, and explained that the high bid must survive a "bid interval" of 24 hours, which was subject to adjustment, in order to win. Id. at 18, 20.  Notice of any "changes to the sale" was considered "satisfactory" upon being "made available on the [auction] website."  Id. at 20-21.

The opening bid was set at $10 million, and the minimum bid increment was set at $150,000.  Id. at 9.  Parties interested in participating in the online auction were required to complete a three-step process involving online registration at RealEstateSales.gov, completion of a registration form, and submission of a $100,000 registration deposit.  Id. at 18-19.  The online registration allowed participants to "browse and place bids; track items of interest; follow auctions where bids have been placed; [update] personal information and settings; and . . . access an easy-to-use online Help Menu."  Id. at 19.

Meanwhile, the registration form and deposit were required to be received in the GSA's Atlanta office "prior to the announced date and time for the receipt of final bids."  Id.  Vitaliya Dashevskaya was the GSA's point of contact for sales information, online auction assistance, receipt of the bid form and registration deposit, and for property tours.[2]  Id. at 9.  Bids were required to be submitted "without contingencies," in cash only,[3] and "[could not] be lowered or canceled."  Id. at 18-19.  Within ten days of acceptance, the winning bidder was required to deposit additional earnest money that, when combined with the registration deposit, was at least ten percent of its total bid.  Id. at 21.  The remainder of the purchase price was due at closing.  Id.

---

[1]  All times referenced in this opinion are for the Eastern time zone.

[2]  Ms. Dashevskaya was a GSA project manager at the time of the events in question. Pl.'s Mot. Ex. N at 2.

[3]  Buyers were "expected to arrange their own financing and pay the balance in full by the closing date."  Pl.'s Mot. Ex. E at 18.

The Instructions to Bidders also provided that registration deposits for rejected bids would be refunded without interest "after the last day of the auction or upon [a bidder's] written request to withdraw from the auction unless the bidder [was] the first or second highest bidder." Id.  The second-highest (i.e., backup) bidder would be considered for acceptance until the high bidder either completed the transaction or defaulted, and would receive a refund of its registration deposit if it did not become the high bidder.  Id. at 22.

Finally, the Notices and Covenants portion of the IFB included the following term:

> [Purchaser] agrees and acknowledges that [the GSA] is selling the property strictly on an "as is, where is[,"] with all faults basis, without warranty, expressed or implied, and with any and all latent and patent defects. . . .  [Purchaser] acknowledges that it is not relying upon any representation, warranty statement or other assertion of the [GSA] . . . .  [The federal government] disclaim[s] any and all express or implied warranties and specifically make[s] no warranties of title, habitability, merchantability, suitability, fitness for any purpose, or <u>any other warranty whatsoever</u>.

Id. at 24 (emphasis added).

## C.  Plaintiff's Organizational Structure

Plaintiff is a Delaware limited liability company with its principal place of business in Lewes, Delaware.  Compl. ¶ 3.  Plaintiff is manager-managed; Theodore Ahlgren is the sole manager.  Def.'s Cross-Mot. A98.  Mikel Rastegar serves as secretary, id., and in-house counsel, Pl.'s Mot. Ex. J at 3-4.  Mr. Rastegar has been a member of the State Bar of California since June 2006.  Attorney Search, State Bar of Cal., http://members.calbar.ca.gov/fal/Member/Detail/243289 (last visited Oct. 13, 2017).

## D.  Bidding Activity

On or about August 16, 2015, Mr. Rastegar read the IFB and began discussing the Metro West property with Mr. Ahlgren.  Def.'s Cross-Mot. A99-100.  Messrs. Ahlgren and Rastegar then decided to submit a bid.  Id. at A101.  On or about August 17, 2015, Baltimore city officials informed Mr. Rastegar that Metro West "would not necessarily be reassessed to the sale price." Id. at A102.  At 8:13 p.m. that same day, Mr. Rastegar sent Ms. Dashevskaya an electronic-mail message in which he reported sending bid registration documents and the bid deposit via Federal Express.  Pl.'s Mot. Ex. F at 1.  He also provided the Federal Express tracking number and a username.[4]  Id.

---

[4]  The record does not reflect the purpose of the username, but ostensibly it was for the GSA's online auction system.  See Pl.'s Mot. Ex. E at 25 (containing the Bidder Registration and Bid Form, which provides a space for indicating the bidder's RealEstateSales.gov username).

The following day, August 18, 2015, several electronic-mail messages were exchanged:

- 11:29 a.m.—Ms. Dashevskaya acknowledged receipt of plaintiff's bid registration deposit and notified Mr. Rastegar that, before he would be allowed to bid, he needed to provide plaintiff's tax identification number and a corrected certification authorizing him to bid on behalf of plaintiff.  Pl.'s Mot. Ex. G at 1.

- 12:43 p.m.—Ms. Dashevskaya reminded Mr. Rastegar that the auction was "scheduled to close in about an hour" and provided contact information for follow-up questions.  Id. at 3.

- 1:26 p.m.—Ms. Dashevskaya forwarded a form to Mr. Rastegar for execution and, to verify the availability of funds for the bid registration deposit, asked for information regarding the bank from which the funds were to be withdrawn.[5]  Id. at 8.

- 1:28 p.m.—Mr. Rastegar forwarded the form to Mr. Ahlgren.  Id.

- 1:32 p.m.—Mr. Ahlgren returned the form to Mr. Rastegar.  Id.

- 1:37 p.m.—Mr. Rastegar forwarded the executed form to Ms. Dashevskaya.  Id. at 7-8.

- 1:38 p.m.—Ms. Dashevskaya reiterated the GSA's request for banking information with respect to the bid registration deposit.  Id. at 7.

Shortly thereafter, at 1:55:49 p.m., the GSA extended the closing date of the online auction to September 1, 2015.  Def.'s Cross-Mot. A30.  At 1:55:57 p.m., plaintiff submitted a bid to purchase Metro West for $10 million.  Id. (reflecting the precise timing of the bid); Pl.'s Mot. Ex. I at 1, Ex. P at 3 (reflecting the bid amount).  At 2:12:54 p.m., the closing date of the online auction was reset to August 20, 2015, at 2:00 p.m.  Def.'s Cross-Mot. A30.

At 1:55 p.m. on August 20, 2015, the auction was extended an additional eight days to August 28, 2015.  Id. at A52.  On August 28, 2015, AAA Fire & Safety Equipment Co., Inc. ("AAA Fire & Safety") submitted a bid for $10,150,000, thereby extending the auction for an

---

[5]  The electronic-mail message does not indicate the specific nature of the form, but it appears to be the Certificate of Corporate Bidder referenced in an electronic-mail message sent earlier that day.  See Pl.'s Mot. Ex. E at 26 (Certificate of Corporate/Organization Bidder); Pl.'s Mot. Ex. G at 1 (asking Mr. Rastegar to submit an updated certification).

additional twenty-four hours. Id. at A54, A61. The auction closed the following day, August 29, 2015, with no additional bids having been submitted. Id. at A55. Three other bidders registered for the auction and provided deposits, but ultimately chose not to bid. Pl.'s Mot. Ex. K at 1.

### E.  Plaintiff Attempts to Retract Its Bid

After placing plaintiff's bid, Mr. Rastegar discovered, "on a proprietary website," that a portion of the Metro West property had been appraised for approximately $138 million, Def.'s Cross-Mot. A102, which would result in an annual property tax assessment of "nearly $3 million," Pl.'s Mot. Ex. H at 1. On August 19, 2015, at 9:26 a.m.—less than twenty hours after submitting plaintiff's bid—Mr. Rastegar contacted Ms. Dashevskaya via electronic-mail and stated that plaintiff "would like to retract its bid in order to do additional due diligence on the Metro West [property]," and specifically highlighted the property tax assessment on Metro West. Id. Mr. Rastegar explained that plaintiff had been under the impression that the property would be reappraised for property tax purposes based on the purchase price, but later realized that "would not necessarily be the case." Id. Since he "personally put up the $100,000 deposit," he requested that the GSA refund the deposit and allow plaintiff to provide the deposit should it wish to move forward. Id. at 1-2. He "beg[ged]" for the GSA to allow plaintiff "additional time for [its] due diligence" due to the "huge misunderstanding" involved, and noted that plaintiff's bid had not yet been accepted. Id. at 2.

Ms. Dashevskaya immediately forwarded Mr. Rastegar's electronic-mail message to Kristine Carson, then-chief of the Mid-Atlantic Branch of the GSA Real Property Utilization and Disposal Division, Pl.'s Mot. Ex. I at 2, and disposal contracting officer, Pl.'s Mot. Ex. P at 4. A few hours later, at 12:35 p.m., Ms. Carson responded to Mr. Rastegar.[6] Pl.'s Mot. Ex. I at 1. She explained that plaintiff's $10 million offer was a "binding offer" and, as such, the GSA was "unable to retract [plaintiff's] bid and return [plaintiff's] deposit." Id. She also emphasized that while the GSA "appreciate[d plaintiff's] concerns with regard to the tax assessment of [Metro West]," the property was specifically "sold as-is and the responsibility for conducting any due diligence deemed necessary for [tax] issues, as well as other conditions, [was] placed on the bidder." Id. In addition, Ms. Carson reminded Mr. Rastegar that the auction was still open, provided contact information for a telephone conversation if he desired to discuss the situation, noted that the federal government was not subject to property taxes, and recommended that he contact the Maryland State Department of Assessments and Taxation ("SDAT") to "fully vet the possibilities of a reduction in [Metro West's] assessment." Id. at 1-2. That same day, the GSA also began working with the SDAT concerning the property tax assessment for Metro West, recognizing that "it [would] benefit whoever buys the property" if reassessment could occur prior to sale. Pl.'s Mot. Ex. W at 1 (discussing an August 19, 2015 telephone call between the GSA division director and the SDAT).

---

[6] Ms. Carson conferred with other GSA officials before responding. See, e.g., Def.'s Cross-Mot. A38-39.

Mr. Rastegar replied a few hours later, at 4:24 p.m., and explained that plaintiff was "choosing to retract [its] bid in less than 24 hours" after placing its bid due to the discovery of "material facts that were not disclosed in the [IFB]." Pl.'s Mot. Ex. J at 5. He also emphasized that, because he "personally put up the deposit money on [plaintiff's] behalf," he would not "just [forgo] the amount." Id. He requested that the auction be extended, expressed hope of avoiding a "legal debate," and asked to "speak with the adviser in charge." Id. In an electronic-mail response that was sent ten minutes later, at 4:34 p.m., Ms. Carson asked Mr. Rastegar for more information regarding the alleged legal matters and undisclosed material facts, indicated that she had attempted to reach him by telephone, and suggested holding a teleconference the following day. Id. at 4.

Just after midnight on August 20, 2015, at 12:26 a.m., Mr. Rastegar replied to Ms. Carson's electronic-mail message. Id. at 1. He remarked that he had "not once . . . had an issue" in having "personally made purchases [from] the GSA several times." Id. at 2. He pled with the GSA to "make [a] one[-]time exception" and refund his deposit "without having to turn this issue into a bigger matter," id. at 3, and advanced the following arguments:

- He attempted to revoke plaintiff's bid while the auction was still ongoing, and before the bid had been accepted. Id. at 2. The "Revocation of Bid and Default" section of the IFB did not address how the bid deposit was to be handled in such a scenario. Id.

- "[M]aterial facts about the sale and building [were] not disclosed." Id.

- Despite "several issues that [came] to [plaintiff's] attention that [caused plaintiff] to want to do additional due diligence before consummating the transaction," plaintiff was "still very interested" in purchasing Metro West. Id. The GSA's failure to provide "material information that should have been disclosed" affected plaintiff's "overall decision"; however, plaintiff "[did] not want to fully dismiss [the] transaction" and was willing to work with other entities to "partner up and/or lease the property." Id. at 3.

- The local economic and political climate surrounding Metro West provided for a "very challenging" and "difficult" environment. Id. at 2-3.

- Plaintiff had concerns regarding the property tax assessment, including the city's position on the matter. Id. at 2, 4.

- The GSA failed to disclose several relevant facts, including the following:

  - "ongoing concerns" about safety, specifically a nearby homeless camp and Rite Aid Pharmacy that had been "burned out in [a] recent riot," referencing media coverage generally, id. at 3;

  - the "shift of major private-sector employers" from Baltimore's downtown business district to Inner Harbor East, referencing the Maryland Community News website, id.;

  - the GSA's receipt of "[i]deas from the development community" regarding Metro West, referencing a GSA website, which led to the GSA's "[thorough] knowledge as to what could and could not be done with the space" and "its shortcomings," particularly the "buildings['] operating systems" and "[s]pecifically the HVAC units," id.; and

  - the 1.4-mile highway stub that "runs around and through the [Metro West] complex" impeded the property's "redevelopment potential," referencing the Baltimore Brew news website, id.

- The city of Baltimore estimated the "annual operating costs" of Metro West at "nearly $1.8 million." Id. at 4.

- He could not afford to lose a deposit for which he was personally liable; doing so was "just out of the question." Id. at 2-3.

- He did not want to have the parties "get involved in litigation." Id. at 2.

Later that same day, on August 20, 2015, at 1:58 p.m., Ms. Carson informed Mr. Rastegar that the auction had been extended until August 28, 2015, at 2:00 p.m, and offered to set up a teleconference. Id. at 1. The next day, August 21, 2015, at 5:27 p.m., Ms. Dashevskaya sent Mr. Rastegar an electronic-mail message containing contact information for the University of Maryland and the Maryland Department of Human Resources, which had previously expressed interest in Metro West. Compl. Ex. 16 at 2. A few hours later, at 8:55 p.m., Mr. Rastegar again emphasized, in an electronic-mail message to Ms. Carson, that (1) plaintiff's bid had not been accepted by the GSA, (2) Section 9 of the General Terms of Sale only discussed bid revocations in four particular scenarios, none of which was applicable; and (3) the GSA failed to

disclose material facts.  Def.'s Cross-Mot. A58-59.  He again implored the GSA to "dismiss the issue surrounding the deposit" and to instead "move forward in trying to make a deal."  Id. at A59.

At 12:59 p.m. on August 24, 2015, the next business day, Ms. Carson replied to Mr. Rastegar via electronic-mail.  Id. at A58.  She explained that, pursuant to the terms and conditions of the IFB, plaintiff's bid was a "binding and continuing offer" with the GSA for "[sixty] calendar days after the close of the auction until the bid is accepted or rejected."  Id.  She stressed that plaintiff could revoke its bid, but the bid deposit would then "be forfeited as damages for breach of contract."  Id.  She remarked that the extension of the auction period provided plaintiff "an opportunity to continue with due diligence" and that the GSA would continue working with plaintiff.  Id.

Mr. Rastegar responded at 6:03 p.m. that same day, expressing disappointment with the decision to deny his deposit refund request.  Id. at A57.  In addition, he again threatened legal action, asked that the parties "agree to a lesser amount than $100,000," and requested information concerning the tax assessment and any leads the GSA may have had regarding selling or leasing the property.  Id.  Ms. Dashevskaya, who had been copied on the earlier messages, replied just over an hour later, at 7:20 p.m., and referenced the August 21, 2015 electronic-mail correspondence with respect to Mr. Rastegar's queries.  Id.  The following day, on August 25, 2015, Ms. Carson also responded.  Compl. Ex. 15 at 2.  She promised that the GSA would "investigate the tax issue . . . and share any positive movement," referenced the August 21, 2015 electronic-mail correspondence, averred that information concerning private parties could not be disclosed, and expressed a willingness to discuss "other matters [the GSA] can accommodate in furtherance of the sale."  Id.  In an electronic-mail response sent later in the evening, Mr. Rastegar maintained his disagreement with the GSA regarding the bid deposit, declared that he was "in the process of filing a claim," asked the GSA to reconsider its position, expressed a willingness to agree to a lesser deposit amount, requested that the auction be extended, and argued against the GSA's refusal to disclose information concerning other private parties.  Id. at 1.

On August 28, 2015, at 2:45 a.m., Mr. Rastegar informed Ms. Dashevskaya that neither the Maryland Department of Human Resources nor the University of Maryland anticipated a need for the Metro West property at any future point, asked that the auction be extended, revisited his request for a "middle ground[]" with respect to the deposit, and highlighted his "difficult position . . . on a personal level."  Compl. Ex. 16 at 1-2.  As previously noted, the auction was automatically extended for an additional twenty-four hours as a result of AAA Fire & Safety's submission of the highest bid on August 28, 2015.  Consequently, at the time of the closing of the auction on August 29, 2015, plaintiff was the second-highest (i.e., backup) bidder.  See supra Section I.D.

Meanwhile, the GSA continued to pursue property tax reassessment with the SDAT.  See Pl.'s Mot. Ex. N (containing a September 4, 2015 letter from Ms. Carson to the SDAT director that referenced prior communications).

### F. The GSA Accepts Plaintiff's Offer

On September 11, 2015, Mr. Rastegar asked for an "update" on "[w]hen [his] deposit [would] be returned." Def.'s Cross-Mot. A56. Ms. Dashevskaya responded later that afternoon, explaining that since plaintiff was the back-up bidder, its bid remained a continuing offer pending the performance of the high bidder. Id. She also promised to update him after such deadline passed. Id. When Mr. Rastegar asked for another update three days later, Ms. Dashevskaya emphasized the same points. Compl. Ex. 17 at 1-2. On September 16, 2015, Mr. Rastegar again asked for an update, noted that the time for the high bidder's performance had expired the previous day, stressed that waiting sixty days "to have my funds released . . . is completely unreasonable," remarked that the GSA already "[had] another buyer's deposit," and observed that the GSA had previously "been put on notice . . . as to why [plaintiff was] not interested" in consummating the transaction. Compl. Ex. 18 at 1. The following day, on September 17, 2015, the GSA extended the deadline for the high bidder's performance. Def.'s Cross-Mot. A61.

The GSA defaulted the high bidder, AAA Fire & Safety, on September 25, 2015, after it failed to provide additional earnest money and disclosure information by the September 24, 2015 extended deadline. Id. at A60-61; see also Pl.'s Mot. Ex. O at 2 (reflecting that the "high bidder notified [the] GSA that they [would] not proceed with the purchase due to issues with property tax, location . . . and the political situation in the area" and, accordingly, "was found in default" and forfeited its bid deposit); Pl.'s Mot. Ex. K at 2 (same, and noting that the high bidder had "concluded to forgo [its] registration deposit" rather than proceed with the purchase).

On September 28, 2015, the GSA formally accepted plaintiff's bid of $10 million to purchase Metro West. Pl.'s Mot. Ex. P. In transmitting the acceptance letter, Ms. Dashevskaya remarked that while the GSA was aware of Mr. Rastegar's position, plaintiff's bid constituted a binding offer. Id. at 1. The acceptance letter included instructions for providing the required $900,000 in additional earnest money no later than October 13, 2015, and indicated that closing would take place "[o]n a mutually acceptable date" within sixty days of the September 28, 2015 acceptance, at which time the balance of the purchase price would be due. Id. at 3-4.

### G. The GSA Finds Plaintiff in Default

Almost immediately after receiving the acceptance letter, Mr. Rastegar responded via electronic-mail message, and declared that plaintiff had retracted its bid before acceptance and was therefore entitled to a refund of the deposit:

> What offer are you accepting[?] [Plaintiff] immediately retracted [its] offer before it was accepted and I made this very clear, including not wanting to have anything to do as the "backup offer."

> Please refund my deposit and re-list the property.  This is
> no way for the government to be handling this matter and if you
> pursue this, you leave me no choice but to file a claim.
>
> Why [is the GSA] making this so difficult[?]  . . .
>
> I will not lose my personal $100,000 deposit. . . .
>
> You had your buyer, and they did not want it.  Please re-list
> the property for the right party to buy it.

Pl.'s Mot. Ex. Q.

While awaiting plaintiff's performance with respect to the October 13, 2015 deadline for providing additional earnest money, the GSA continued to work with the SDAT concerning the Metro West property tax assessment.  See Pl.'s Mot. Exs. D, AA.  On October 14, 2015, Ms. Carson issued plaintiff a default notice after it failed to provide the required earnest money.  Pl.'s Mot. Ex. R.  In the default notice, the GSA stated that plaintiff's "$100,000 bid deposit [would] be retained as liquidated damages" pursuant to the IFB.  Id. at 3.

### H.  The GSA Sells Metro West

Sometime prior to January 1, 2016, Metro West was reassessed for property tax purposes at $7.25 million.[7]  Pl.'s Mot. Ex. U at 2, 4.  Meanwhile, on December 3, 2015, the GSA announced that it would offer Metro West for sale via sealed bid auction, with bids due no later than January 27, 2016.  Pl.'s Mot. Ex. S.  See generally Pl.'s Mot. Ex. T (containing the IFB for the sealed bid sale).  Eight bids were received.  Pl.'s Mot. Ex. V at 1.  The high bidder was Greene Street Ventures LLC.  Id.  Metro West was formally transferred to Greene Street Ventures LLC on April 12, 2016, for a $7,073,739 sale price.  Pl.'s Mot. Ex. U at 2, 4.

### I.  Procedural History

Plaintiff filed suit on April 4, 2016, alleging breach of contract by the GSA and invoking this court's Tucker Act jurisdiction under 28 U.S.C. § 1491(a)(1) (2012).  Compl. ¶¶ 1-2.  After defendant answered, the parties filed a joint preliminary status report in which they indicated that "there are no genuine issues of material fact" and identified "two relevant legal issues":

> 1)  whether the [IFB] can be interpreted either to permit or prevent
> [plaintiff] from withdrawing its bid; and

---

[7]  The two parcels comprising Metro West were valued for property tax purposes at $3,467,500 and $3,782,500 as of January 1, 2016.  Pl.'s Mot. Ex. U at 2, 4.

2) whether the [GSA] breached a duty of good faith and fair
   dealing in its treatment of the assessed valuation of the
   property.

Joint Prelim. Status Report 2, Aug. 31, 2016.  Following the completion of discovery, the parties
filed cross-motions for summary judgment.  The motions are now fully briefed, and the court
considers oral argument unnecessary.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the
moving party is entitled to judgment as a matter of law.  RCFC 56(a); Celotex Corp. v. Catrett,
477 U.S. 317, 322 (1986).  Entry of summary judgment is mandated against a party who fails to
establish "an element essential to that party's case, and on which that party will bear the burden
of proof at trial."  Celotex, 477 U.S. at 322.

In ruling on cross-motions for summary judgment, the court "must evaluate each motion
on its own merits."  First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir.
2003).  If neither party meets its burden, then the court must deny both motions.  Bubble Room,
Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998).

## III.  ANALYSIS

To prove a breach of contract, a plaintiff must establish "(1) a valid contract between the
parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and
(4) damages caused by the breach."  Century Expl. New Orleans, LLC v. United States, 110 Fed.
Cl. 148, 163 (2013) (citing San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959
(Fed. Cir. 1989)).  Once a breach of contract is established, the burden shifts to the defendant to
plead and prove affirmative defenses that excuse the breach.  Shell Oil Co. v. United States, 751
F.3d 1282, 1297 (Fed. Cir. 2014) (citing Stockton E. Water Dist. v. United States, 583 F.3d
1344, 1360 (Fed. Cir. 2009)).

In the case at bar, the parties have implicitly assumed, and the court concludes, that the
IFB was a solicitation for offers.  Cf. Nat'l Air Cargo Grp., Inc. v. United States, 127 Fed. Cl.
707, 718 (2016) ("[T]he parties have implicitly assumed that the government's [Request for
Proposals] was a solicitation for an offer.").  Plaintiff asserts that the parties had an "implied-in-
fact contract" that was breached when the GSA failed to honor its bid revocation.  Pl.'s Mot. 5-6.
Defendant does not challenge plaintiff's position, and observes that plaintiff made a "continuing
offer" that "could not be revoked" and thus an express contract was formed upon the GSA's
acceptance of plaintiff's bid.  Def.'s Cross-Mot. 13-14.  Therefore, the parties do not dispute, and
the court concludes, that there was a contractual relationship between plaintiff and the GSA.[8]

---

[8]  Because there was a contractual relationship between the parties, and because plaintiff
seeks money damages, the court is satisfied that, pursuant to 28 U.S.C. § 1491(a)(1), it has
subject matter jurisdiction to entertain the instant case.

Although the parties agree regarding the existence of a contractual relationship between them, the parties disagree concerning the nature of their respective contractual duties and, consequently, whether one or more of those duties was breached. The nature of any such duties is a matter of contract interpretation. Kogan v. United States, 112 Fed. Cl. 253, 264 (2013). Contract interpretation, including the interpretation of government contracts, is a matter of law. Medlin Constr. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1199-200 (Fed. Cir. 2006); see also Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir. 2010) (explaining that general rules of contract interpretation apply to federal government contracts). As such, issues concerning contract interpretation are "generally amenable to summary judgment." Varilease Tech. Group, Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002). Therefore, resolving the instant cross-motions requires the court to "identify and apply 'principles of general contract law.'" Praecomm, Inc. v. United States, 78 Fed. Cl. 5, 10 (2007) (quoting Franconia Assocs. v. United States, 536 U.S. 129, 141 (2002)).

## A. Principles of Contract Interpretation

The court applies "three primary rules of contract interpretation." Enron Fed. Sols., Inc. v. United States, 80 Fed. Cl. 382, 393 (2008). First, contract interpretation "begins with the language of the written agreement." NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004); see also Enron Fed. Sols., 80 Fed. Cl. at 393 (stating that contract interpretation "start[s] with the plain meaning of the Contract's text"). A contract "is read in accordance with its express terms and the plain meaning thereof." C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993); accord U.S. Sur. Co. v. United States, 83 Fed. Cl. 306, 311 (2008). These terms are given "their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998). The contract language "must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." Metric Constructors, Inc. v. NASA, 169 F.3d 747, 752 (Fed. Cir. 1999) (internal quotation marks omitted). Thus, "any subjective, unexpressed intent of one of the parties is ineffective." Sterling, Winchester & Long, L.L.C. v. United States, 83 Fed. Cl. 179, 183 (2008).

Second, the court applies the "settled principle[] of contract interpretation," Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996), that a contract "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts," NVT Techs., 370 F.3d at 1159. Such an interpretation "is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." Id. (citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)); see also United Int'l Investigative Serv. v. United States, 109 F.3d 734, 737 (Fed. Cir. 1997) (stating that the interpretation of a contract must "avoid[] conflict or surplusage of its provisions").

Third, "[t]he mere fact that the parties disagree with regard to the interpretation of a specific provision, does not, standing alone, render that provision ambiguous." Enron Fed. Sols., 80 Fed. Cl. at 393; accord Metric Constructors, 169 F.3d at 751 ("To show an ambiguity[,] it is

not enough that the parties differ in their respective interpretations of a contract term.”).
“Whether a contract provision is ambiguous is . . . a question of law.” <u>NVT Techs</u>, 370 F.3d at
1159.

### 1. Unambiguous Contract Provisions

When a contract term is “clear and unambiguous on its face, the plain and ordinary
meaning of the contract controls.” <u>Sterling, Winchester & Long</u>, 83 Fed. Cl. at 183. As such,
the court “cannot assign it another meaning, no matter how reasonable that other meaning might
seem to be.” <u>Triax Pac., Inc. v. West</u>, 130 F.3d 1469, 1473 (Fed. Cir. 1997). As a “rule of
substantive law,” <u>Barron Bancshares, Inc. v. United States</u>, 366 F.3d 1360, 1375 (Fed. Cir.
2004), the “parol evidence rule renders inadmissible evidence introduced to modify, supplement,
or interpret the terms of a fully integrated, unambiguous agreement,” <u>Zafer Taahhut Insaat ve
Ticaret A.S. v. United States</u>, 833 F.3d 1356, 1366 (Fed. Cir. 2016) (internal quotation marks
omitted). In other words, courts give clear and unambiguous contract provisions “their plain and
ordinary meaning and will not resort to parol evidence.” <u>Barseback Kraft AB v. United States</u>,
121 F.3d 1475, 1479 (Fed. Cir. 1997). Using extrinsic evidence to interpret unambiguous terms
“would cast a long shadow of uncertainty over all transactions and contracts.” <u>McAbee Constr.
Inc. v. United States</u>, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (internal quotation marks omitted).

### 2. Ambiguous Contract Provisions

An ambiguity exists when the parties to a contract have different interpretations of a
contractual provision that are both reasonable. <u>LAI Servs., Inc. v. Gates</u>, 573 F.3d 1306, 1314
(Fed. Cir. 2009) (citing <u>Metric Constructors</u>, 169 F.3d at 751). Where the contract language is
ambiguous, disputed issues of fact may arise concerning the parties’ intent. <u>Perry-McCall
Constr., Inc. v. United States</u>, 46 Fed. Cl. 664, 672 (2000). A court’s task is to construe a
contract “to effect the parties’ intent at the time they executed the [contract].” <u>Dureiko v. United
States</u>, 209 F.3d 1345, 1356-57 (Fed. Cir. 2000). However, the court need not resolve any
ambiguities because, as explained below, the IFB is unambiguous.

### B. The GSA Did Not Breach Its Duty of Good Faith and Fair Dealing

The court first addresses the implied duty of good faith and fair dealing. According to
plaintiff, the GSA’s failure “to provide critical information on the property tax assessment and
the determined highest and best use” of Metro West constituted a breach of its “duty of good
faith and fair dealing.” Pl.’s Mot. 11. Plaintiff also faults the GSA for failing to advise it “of the
option of registering but not bidding,” which caused plaintiff to believe that it had “no option but
to proceed with a bid without knowing that an extension of the auction could be requested.” <u>Id.</u>
at 8. Plaintiff avers that had it “had time even for limited due diligence, . . . [it] would not have
bid.” Pl.’s Resp. Def.’s Cross-Mot. Summ. J. (“Pl.’s Resp.”) 5. On the other hand, defendant
argues that “it is not a breach of the duty of good faith and fair dealing to fail to inform the
plaintiff of information that could be uncovered through due diligence.” Def.’s Cross-Mot. 15.
Defendant also argues that, in any event, “[t]he IFB expressly disavowed any warranty on the
[Metro West] property.” Def.’s Reply Supp. Cross-Mot. Summ. J. (“Def.’s Reply”) 4.

In every contract, including government contracts, both parties maintain an implied duty of good faith and fair dealing.  See Alabama v. North Carolina, 560 U.S. 330, 351 (2010); Metcalf Constr. Co. v. United States, 742 F.3d 984, 990 (Fed. Cir. 2014); Bell/Heery v. United States, 739 F.3d 1324, 1334 (Fed. Cir. 2014); Precision Pine, 596 F.3d at 828; Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005); Ingham Reg'l Med. Ctr. v. United States, 126 Fed. Cl. 1, 44 (2016); Restatement (Second) of Contracts § 205 (Am. Law Inst. 1981).  The "implied duty of good faith and fair dealing" can also be understood as the "implied duty not to hinder and the implied duty to cooperate."  Precision Pine, 596 F.3d at 827.  "Government actions that are unreasonable under the circumstances" are sufficient to constitute a breach of the implied duty not to hinder performance.  Tecom, Inc. v. United States, 66 Fed. Cl. 736, 770 (2005).  Similarly, government "failure to provide assistance at the request of a contractor has amounted to a breach of the duty to cooperate" in certain situations.  Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 78 (2000).  Failure to fulfill the implied duty of good faith and fair dealing "constitutes a breach of contract," the same as if an explicit contractual provision was violated.  Metcalf, 742 F.3d at 990.  The implied duty of good faith and fair dealing exists "because it is rarely possible to anticipate in contract language every possible action or omission by a party that undermines the bargain."  Id. at 991.

While plaintiff cites no case law or other authority in support of its position concerning the duty of good faith and fair dealing in its opening brief, the duty requires government actors to "disclose information fundamental to the preparation of [bids] or contract performance."[9]  Miller Elevator Co., Inc. v. United States, 30 Fed. Cl. 662, 674 (1994).  Such required disclosure applies to the type of "superior knowledge," id. at 675, that plaintiff alleges.  Without doing so explicitly, plaintiff thus invokes the doctrine of superior knowledge, which "imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance."  Giesler v. United States, 232 F.3d 864, 876 (Fed. Cir. 2000), quoted in Scott Timber Co. v. United States, 692 F.3d 1365, 1373 (Fed. Cir. 2012); accord AT&T Commc'ns, Inc. v. Perry, 296 F.3d 1307, 1312 (Fed. Cir. 2002) ("[T]he government may breach a contract by withholding information when it has superior knowledge of that information and a duty to disclose it to the contractor.").

However, the doctrine of superior knowledge "only applies if the government was aware the contractor had no knowledge of and had no reason to obtain such information and any contract specification supplied misled the contractor or did not put it on notice to inquire."  Scott Timber, 692 F.3d at 1373 (internal quotation marks omitted).  In Scott Timber, the plaintiff was awarded certain timber contracts on federal land following an oral auction conducted by the United States Forest Service ("Forest Service").  Id. at 1368.  At the auction, the Forest Service read a notice that apprised prospective bidders of the potential for contract awards to be delayed due to then-pending environmental litigation.  Id. at 1368.  The notice did not disclose that the

---

[9]  In its response brief, plaintiff makes a passing reference to the notion that "[s]ubterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified."  Pl.'s Resp. 5 (internal quotation marks omitted) (relying on Metcalf, 742 F.3d at 990-91; Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir. 1988); Restatement (Second) of Contracts, supra, at § 205 cmt. d).

plaintiff's contracts were among several contracts that, during settlement negotiations in the pending litigation, had been identified as "at risk" of being delayed. Id. at 1371-72. However, the contracts themselves "included provisions . . . authorizing the Forest Service to suspend the awarded contracts in order to comply, for example, with a court order" and provided that the "sole and exclusive remedy" for any such delays would be to invoke the contract term adjustment portion of the contract. Id. at 1368-69. Approximately two months after the contracts were awarded, an order was issued in the pending litigation—which had always been in the public domain—that resulted in the Forest Service suspending the contracts. Id. at 1368-70. The plaintiff then sued for breach of contract, and the trial court determined (among other issues) that the Forest Service breached its implied duty of good faith and fair dealing by failing to inform the plaintiff "of the specific risks to its contracts" being suspended due to the pending litigation. Id. at 1370-72 (internal quotation marks omitted). The United States Court of Appeals for the Federal Circuit ("Federal Circuit") reversed, explaining that there was no breach of the duty of good faith and fair dealing for failure to disclose superior knowledge because the Forest Service "did not mislead" the plaintiff despite its failure to disclose the specific risks to the relevant contracts. Id. at 1373. The Federal Circuit emphasized that the Forest Service provided ample pre-auction notice to all bidders that their contracts risked being suspended due to the pending litigation, the notice was "far more explicit than notices found sufficient in other cases," and, in any event, an explicit notice was not required given the circumstances. Id.

Further, in Giesler, the Federal Circuit found the protester's superior knowledge theory to be unavailing because the information at issue was publicly available. 232 F.3d at 877. At issue in Giesler was the inclusion of a specification in the Request for Proposals that was not defined therein, but which stood for "a certain 'Commercial Item Description' published by the [United States Department of Commerce]." Id. at 867. The Federal Circuit noted that the protester "was familiar with this coding system," id. at 870, and explained that "[b]ecause [the protester] could have readily obtained this information, the government was not obliged to volunteer it." Id. at 877.

Accordingly, plaintiff's argument concerning the GSA's failure to disclose information concerning the property tax assessment and the highest and best use of the Metro West property is utterly without merit. Federal agencies are "under no duty to volunteer information which the contractor can reasonably be expected to seek out [it]self"—for example, in "situations where the information at issue can readily be obtained from outside sources, or where the contract itself contemplates a certain means by which the information might be acquired, such as by site investigation." Petrofsky v. United States, 222 Ct. Cl. 450, 456 (1980). The IFB (1) placed potential bidders on notice that Metro West was being sold on an "as-is" basis, i.e., with no warranties whatsoever; (2) contained multiple explicit warnings to potential bidders that they must rely on their own due diligence; (3) provided for site inspections; and (4) included statements indicating that failure to be "fully informed," whether via "omission of any information available to the [GSA]" or otherwise, would not constitute grounds for revoking a bid. In other words, all potential bidders, including plaintiff, were reasonably expected to seek out any information they deemed relevant. See, e.g., Kroll v. United States, 107 Fed. Cl. 605, 610, 612 (2012) (explaining that the bidder in a government foreclosure sale "could not reasonably have relied on the information provided by [the government] where the [auction]

documents so clearly and explicitly advised against it" and "contained numerous references to the bidder's burden to conduct due diligence"). The provisions of the IFB were very clear, and should have been particularly obvious to a licensed attorney such as Mr. Rastegar. Even if Mr. Rastegar was unaware of those provisions, plaintiff would not be entitled to relief because of the long-established principle that "a contractor who submits [its] bid without reading all of the specifications does so at [its own] peril." Dale Ingram, Inc. v. United States, 201 Ct. Cl. 56, 70 (1973), quoted in Renda Marine, Inc. v. United States, 66 Fed. Cl. 639, 655 (2005).

Further, the property tax assessment history for Metro West was, and remains, publicly available. Mr. Rastegar was even told by Baltimore city officials, prior to placing the bid, that Metro West would not necessarily be reassessed based on the sale price.[10] Mr. Rastegar's ability to uncover voluminous information concerning Metro West, including its property tax assessment, within three days of first learning of the online auction demonstrates that the information at issue was readily obtainable. Therefore, the court concludes that the GSA was under no duty to disclose any information concerning the Metro West property tax assessment, the highest and best use of the property, or the surrounding area.[11]

In sum, the GSA did not violate its duty of good faith and fair dealing by failing to disclose relevant information. The information that plaintiff proclaims the GSA should have disclosed was publicly available. Moreover, plaintiff was expected to perform its own due diligence prior to placing a bid. To the extent that plaintiff lacked an opportunity to perform due diligence prior to bidding, such a predicament is, as defendant indicates, a "circumstance of [plaintiff's] own creation." Def.'s Reply 6.

## C. The GSA Did Not Breach the Express Terms of the IFB

In addition to the allegations concerning the GSA's purported breach of its duty of good faith and fair dealing, plaintiff also avers that the GSA is liable for breach of contract based on the GSA's "refus[al] to accept [plaintiff's] prompt revocation of its bid and refus[al] to return [plaintiff's] registration deposit." Pl.'s Mot. 1. According to plaintiff, the IFB did not prevent

---

[10] Plaintiff's admission that Baltimore city officials advised Mr. Rastegar, prior to bidding, that Metro West would not necessarily be reassessed for property tax purposes based on the sale price demonstrates that Mr. Rastegar was less than candid in attempting to retract plaintiff's bid by averring that plaintiff had been under a contrary impression.

[11] Plaintiff also contends that it was unaware that it could register without placing a bid. This argument lacks credulity, as it is contrary to the known facts of this case. Any lack of awareness is solely attributable to plaintiff's "gross negligence in failing to read the [information provided by the GSA in the IFB]." Giesler, 232 F.3d at 870-71. Indeed, in the IFB, the GSA explained the capabilities of online registrants beyond placing bids, and also explained that there were additional steps between online registration and bid placement. Further, Mr. Rastegar provided a RealEstateSales.gov username to Ms. Dashevskaya before being permitted to place a bid and, in attempting to revoke plaintiff's bid, emphasized his previous experience with GSA auctions.

bidders from retracting a bid before the auction ended, and, in any event, because the IFB permitted, but did not require, the GSA to retain bid deposits and earnest money in certain circumstances, it was an abuse of discretion for the GSA to refuse to refund plaintiff's deposit. Defendant posits that because the required registration deposit "was an enforceable liquidated damages clause" and plaintiff's bid revocation was a "clear violation of the terms of the IFB," plaintiff "is not entitled to the return of its registration deposit." Def.'s Cross-Mot. 12. The central issue here is, as the parties identified, whether the IFB permitted bidders to cancel a bid while the auction was ongoing and before the bid was accepted.

### 1.  Plaintiff Is Bound by the Terms of the IFB

It is well established that contractors "cannot complain" about being "required to perform the contract in accordance with [its] specifications, provided there is no misrepresentation or overreaching by the government." Dale Ingram, 201 Ct. Cl. at 70; accord Refining Assocs. v. United States, 124 Ct. Cl. 115, 122 (1953) ("Where there is no mistake, unreasonable delay, or the like, there can be no injustice in holding the bidder to the conditions of the Invitation for Bids."). As explained previously, the GSA did not act improperly. See supra Section III.B. Mistakes for which relief is available must evince "a discrepancy between an offeror's state of mind and [its] offer," and "do not extend to mistakes of judgment." Tony Downs Foods Co. v. United States, 209 Ct. Cl. 31, 37 (1976); accord id. ("The mistake in plaintiff's bid, if any, resulted not from any clear cut clerical, arithmetical or specification misreading error or a difference between what plaintiff intended to bid and its actual submitted bid. The mistake resulted from plaintiff's mistaken judgment as to economic conditions . . . , a mistake for which relief cannot be granted."). Here, the mistake made by plaintiff was its failure to perform due diligence prior to submitting its bid. Nevertheless, plaintiff asks this court to shift blame from itself to the GSA for the sole reason that Mr. Rastegar seeks to avoid a $100,000 loss. Plaintiff's request lacks foundation. The failure to perform due diligence is not a "mistake" that provides grounds for relief from being held to the terms of the IFB. To hold otherwise would be contrary to law and would reward a litigant who ignored an agency's clearly established ground rules.

### 2.  The Terms of the IFB Unambiguously Precluded Bid Retraction

As plaintiff acknowledges, the IFB provided that bids constituted continuing offers that remained open for sixty days after the close of the auction, and also provided that bids could not be canceled. In addition, the IFB allowed for withdrawal from the auction and a deposit refund "after the last day of the auction or upon written request . . . unless the bidder [was] the first or second highest bidder." Pl.'s Mot. Ex. E at 21. Read together, these provisions are harmonious. A bidder could not unilaterally withdraw its bid during the pendency of the auction, but could withdraw its bid after the close of the auction if the bid was not one of the two highest bids.[12]

---

[12]  A bidder could also "request" to withdraw its bid during the pendency of the auction if it was not one of the two highest bidders. Pl.'s Mot. Ex. E at 21. However, this provision is of no moment. At all times after submitting its bid, plaintiff was either the first- or second-highest bidder.

Further, these provisions are unambiguous because they are susceptible to "only one reasonable interpretation," i.e., "the meaning derived from the contract by a reasonably intelligent person acquainted with the contemporary circumstances." Tecom, 66 Fed. Cl. at 748 (internal quotation marks omitted). Accordingly, the court may not ascribe to them a contrary meaning. Triax Pac., 130 F.3d at 1473. Therefore, plaintiff's position that "[t]he implication of the specific listing [in the IFB] of four circumstances where the deposit must be forfeited is that such forfeit is not automatic in other bid revocation scenarios [and thus] refund of the deposit is not expressly prohibited in the circumstances of this case," Pl.'s Mot. 7, is untenable. An express prohibition in the IFB of bid retraction during the pendency of the auction was unnecessary because the IFB provided that all bids were continuing offers through the pendency of the auction and could not be unilaterally canceled. Indeed, Mr. Rastegar was undoubtedly aware of the plain meaning of the IFB's provisions, at least with respect to bid irrevocability, because he implored the GSA to "make [a] one[-]time exception," Pl.'s Mot. Ex. J at 3, when seeking a refund of plaintiff's deposit. See Renda Marine, 66 Fed. Cl. at 655 (observing that government contractors are "obligated to understand the complexities and consequences of [their] undertaking[s]" (internal quotation marks omitted)).

Plaintiff also suggests that the IFB's prohibition of the "cancellation" of bids does not preclude the "revocation" of bids. Pl.'s Resp. 2. This suggestion fails what is commonly known as the "duck test"—"if it looks like a duck, walks like a duck, and quacks like a duck, then it's a duck," S.I. Stud, Inc. v. United States, 24 F.3d 1394, 1396 (Fed. Cir. 1994) (Plager, J., dissenting)—because the action at issue is the same regardless of the label. In other words, to annul, cancel, invalidate, nix, pull back, quash, recall, renege, renounce, repeal, rescind, retract, revoke, void, or withdraw a bid (among others) is to arrive at the same result, and plaintiff's attempt to split hairs over semantics is unavailing. See William Shakespeare, The Tragedy of Romeo and Juliet act 2, sc. 2 ("What's in a name?  That which we call a rose / By any other word would smell as sweet.").

### 3. The GSA Properly Accepted Plaintiff's Bid

At the close of the auction, plaintiff was the second-highest (i.e., backup) bidder. As such, plaintiff's bid remained a continuing offer that could not be withdrawn without plaintiff breaching the parties' agreement and forfeiting its registration deposit. The GSA then accepted plaintiff's offer after the high bidder defaulted. The GSA's acceptance was transmitted thirty-one days after the auction ended, well within the sixty-day window permitted by the terms of the IFB. At that point, the registration deposit became earnest money towards the purchase price. Upon plaintiff's default, those funds were forfeited. See 1 E. Allan Farnsworth, Farnsworth on Contracts § 3.23 (3d ed. 2004) ("If an offer is irrevocable, a purported revocation by the offeror has no effect on the offeree's power of acceptance. The offeree can accept despite the purported revocation and can sue for breach of the contract if the offeror fails to perform.").

### 4.  The GSA Provided Adequate Consideration for a Nonrevocable Offer

Although the IFB did not allow bids to be withdrawn, plaintiff observes that continuing offers must be supported by consideration, and avers that "[n]o consideration was received by the Plaintiff for making a continuing offer in response to the [IFB]."  Pl.'s Mot. 6.  The proposition that continuing offers are generally revocable unless supported by consideration is well recognized.  See, e.g., 1 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 5:16 (4th ed. 2007) ("[T]he general rule is that the option, as a continuing offer which cannot be withdrawn for a fixed period of time, must be based on consideration . . . . [E]ven a nominal consideration intended to make the offer irrevocable will in general be given effect.").  Defendant does not contest plaintiff's statement of the law, but emphasizes that, in exchange for the "the bid remaining open for [sixty] days after the close of the auction or until accepted or rejected" by the GSA, "[t]he consideration that [plaintiff] received was the ability to have its bid considered on the merits."  Def.'s Cross-Mot. 13 (relying on Refining Assocs., 124 Ct. Cl. at 122, and Scott v. United States, 44 Ct. Cl. 524, 529-30 (1909)).

Defendant is correct.  Plaintiff's bid was "binding as an option contract" because it "recite[d] a purported consideration for the making of the [bid]."  Restatement (Second) of Contracts, supra, at § 87(1)(a).  The bid form that bidders were required to execute provided that all bids were subject to the terms of the IFB, which was specifically incorporated into the bid, and also provided that, in the event the bidder (i.e., plaintiff) did not purchase the property, the deposit would be refunded "as specified in the IFB."  Pl.'s Mot. Ex. E at 25.  Thus, as matters of law, (1) the GSA's duties as set forth in the IFB were recited in plaintiff's bid, and (2) plaintiff agreed to be bound by the IFB.  Further, one of the bedrock principles of contract law is that a "mutuality of obligation" is necessary for a valid contract.  Crewzers Fire Crew Transport, Inc. v. United States, 741 F.3d 1380, 1382-83 (Fed. Cir. 2014).  Plaintiff's position that an implied-in-fact contract existed between itself and the GSA therefore demonstrates that the parties maintained obligations to each other.  Given that "courts do not ordinarily inquire into the adequacy of the consideration," and that even "nominal consideration is regularly held sufficient to support a short-time option proposing an exchange," Restatement (Second) of Contracts, supra, at § 87 cmt. b, the court concludes that the GSA provided sufficient consideration to plaintiff for the irrevocability of its bid.

In addition to the consideration provided by the GSA, plaintiff's bid was irrevocable because plaintiff could have "reasonably expect[ed] to induce action or forbearance of a substantial character on the part of the [GSA] before acceptance," and "such action or forbearance" actually took place.  Id. § 87(2).  In placing its bid, plaintiff reasonably expected, under the GSA's duty of good faith and fair dealing, for the GSA to be cooperative as the transaction progressed.  To that end, the GSA made overtures to the SDAT regarding the reassessment of Metro West for property tax purposes and promptly provided other information concerning Metro West to plaintiff upon Mr. Rastegar's request.[13]

---

[13]  Of course, Mr. Rastegar was free to make the same inquiries to the GSA before bidding on behalf of plaintiff, but he failed to do so.

**5.  Summary**

In sum, the court concludes that the GSA did not breach the express terms of the IFB, and was thus within its authority to retain plaintiff's bid deposit.  To the extent that retaining plaintiff's bid deposit was discretionary, the GSA did not abuse its discretion by adhering to the terms of the IFB.

**IV.  CONCLUSION**

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive, without merit, or unnecessary for resolving the issues before the court.

There is no genuine issue of material fact in the case at bar.  Plaintiff and the GSA were both bound by the terms of the IFB.  With some exceptions not applicable here, the IFB clearly provided that bids could not be withdrawn.  Accordingly, the GSA did not act improperly by retaining plaintiff's bid deposit.  Further, the GSA was under no duty to disclose information concerning the Metro West property tax assessment, or other information regarding the property, because all such information was publicly available.

Simply put, plaintiff is not entitled to relief for its failure to exercise due diligence.  Therefore, the court **DENIES** plaintiff's motion for summary judgment and **GRANTS** defendant's cross-motion for summary judgment.  Plaintiff's complaint is **DISMISSED WITH PREJUDICE**.  No costs.  The clerk is directed to enter judgment accordingly.

The court has filed this opinion under seal.  The parties shall confer to determine proposed redactions that are agreeable to all parties.  Then, **no later than Friday, October 27, 2017**, the parties shall file a joint status report indicating their agreement with the proposed redactions and **attaching a complete copy of the court's opinion with all redactions clearly indicated**.  The parties are also directed to comply with Paragraph 12 of the Protective Order regarding the filing of redacted versions of documents previously filed under seal in this case **no later than Friday, October 27, 2017**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge